Justice BRISTER,
dissenting.
In the name of “efficiency,” several school districts again ask the Texas courts to close the Texas public schools unless the Texas Legislature increases funding. Over the last two decades, we have been asked to do this every two or three years, and have generally complied.
The Court goes too far by doing so again today. First, the Court finds school districts are forced to tax at the highest possible rate only because some of them do. Second, though only five percent of the State’s school districts claim a single statute is unconstitutional, the Court enjoins the State from distributing any money under the current Texas school financing system, an order that applies to every school district in Texas. Thus, because some districts get too little state money, "all districts may get none. It is hard to see how this will help Texas school children.
Yet the Court also does not go far enough. By failing to demand an “efficient system” as the Texas Constitution requires, or to demand standing and proof as Texas law requires, this case once again focuses on short-term funding rather than long-term solutions.
Of course, the true goal of this litigation is to put pressure on the Texas Legislature. We demanded legislative changes by holding the Texas school-finance system unconstitutional in Edgewood I,[1] Edgewood *801 II,[2] and Edgewood III;[3] we warned that we might do so again soon in Edgewood IV[4] and West Orange-Cove I.[5] The Court fulfills that threat today. But there is no end in sight; if the past is any indication, the new funding will not last long, and public education will not change much.
Before we bequeath Edgewood VIII, IX, and X to our grandchildren, we should consider whether we might do more by doing less. As the Court fails to do so today, I respectfully dissent.
I. The Constitution & Efficiency
Since statehood in 1845, every Texas Constitution has required the Legislature to “make suitable provision for the support and maintenance of public schools.”[6] But when Texans adopted the current Constitution in 1876, they added a new word— the Constitution now requires “suitable provision for the support and maintenance of an efficient system of public free schools.”[7]
Were we drafting a constitution today, we might choose a different standard— perhaps an “exemplary” or “comprehensive” or “progressive” or “safe” system of public schools. But in 1876, the people of Texas adopted “efficient” as the constitutional standard, and until that Constitution is amended no court can adopt any other.
When this Court issued Edgewood I in October 1989, we recognized that an “efficient” system would “produce results with little waste.”[8] Nevertheless, we have applied the term in every case since then to require only one thing — “substantially equal access to similar revenues per pupil at similar levels of tax effort.”[9] In other words, “efficient” has meant only “equal ability to raise taxes.”
Perhaps this made sense in 1989 — before the Berlin Wall fell, before the Soviet Union collapsed, and before state-run businesses everywhere proved uncompetitive. Perhaps back then a government system was “efficient” if it could get sufficient public funding.
*802 But surely not now. Today, we know that one thing above all else makes service providers efficient: competition. Even formerly communist countries recognize how efficiency is produced — not by protectionism, not by higher taxes, and not by state control, but by freedom for competition.
Yet the school districts that brought this case never once suggested in six-weeks’ evidence that competition might make the Texas school system more efficient. No one considered fundamental reforms that efficiency might demand. No school expert considered whether it might be efficient to consolidate tiny school districts or redundant school administrations. No one asked whether it might be efficient to transfer students across district lines, or transfer funds to private providers that could meet their needs better. Instead, this trial focused entirely on getting more state funding through more taxes — all else in the system to remain exactly the same.
This, of course, is perfectly natural. Few of us welcome competition, not even judges.[10] Competition is often painful, and requires us to make hard choices we would rather avoid.
But long-standing rules of Texas law do not allow us to wink at these omissions here. First, because Article YII’s education guarantee is a right that belongs to school children rather than school districts, the latter have no standing to assert this claim. Every party in this case was a school district, and every witness in the six-week trial was a school employee or school expert. Not a single attorney represented solely the interests of school students and their families — who might actually favor the broader educational options or lower taxes competition might bring. By overlooking standing, this trial focused too much on the priorities of school districts, and not enough on the priorities of school families.
Second, because Article YIII’s constitutional prohibition of state property taxes is violated only if a school district must tax at the statutory maximum, each district had to prove it was forced to do so. The 47 plaintiff districts alone asserted this, but none proved it. No school district addressed, no expert studied, and none of the trial judge’s 679 findings mentioned why districts were “forced” to make expenditures that other public and private schools often forego, or that other government entities often provide. Nor did anyone consider whether competition or other fundamental reforms might make the system more efficient so that less money was necessary. By lowering the burden of proof, this trial focused on whether school expenditures were reasonable rather than required.
My colleagues say our review of “efficiency” must be limited to funding because “[w]e cannot dictate how the parties present their case.”[11] This Court is not usually such a pushover. When we interpret contracts, statutes, and (above all) constitutions, we are constrained by what they say, not the parties’ briefs. The constitutional guarantee invoked here requires an efficient system of public schools; it cannot be used to demand more funding for an inefficient system.
Nor can we avoid our duty by suggesting that the Legislature demand efficiency *803 when we will not.[12] If efficiency is a justi-ciable question (as the Court holds), then we cannot simply suggest that someone else look into it.
The author of the current school-finance system testified at trial that school districts “were no more wasteful or inefficient than any other State agency or State institution.” But that is not the constitutional standard. For whatever reason, the Texas Constitution mandates efficiency primarily in the State’s courts[13] and schools;[14] they must meet a higher standard because that is what the Constitution requires. If “efficiency” truly means “producing results with little waste,” then someday we ought to apply it to that purpose.
II. Article VII & Standing
A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools.
Texas Constitution, Article VII, § 1
While acknowledging evidence that the public school finance system is inadequate, unsuitable, and inefficient, the Court nevertheless finds no violation of Article VII because “an impending constitutional violation is not an existing one.”[15] We have tried this before, accepting the current system while lamenting it, and warning that the result might be different next time.[16]
But this is the first time we have entertained such complaints in a courtroom with no students. While standing normally requires only an allegation of injury, a two-part test governs standing to challenge the constitutionality of a statute: (1) an allegation of actual or threatened injury under the statute, and (2) an allegation that the statute unconstitutionally restricts the plaintiffs own rights.[17] As all concede, the public-education guarantee in Article VII of the Texas Constitution is a right that belongs to school students, not school districts. Yet only the latter were represented at trial, and as the trial made clear, the interests of the two are not necessarily the same.
Standing is required by two guarantees in the Texas Constitution — separation of powers[18] and open courts.[19] We should not violate these two constitutional provisions in order to decide whether the State violated two others.
*804 A. A Question We Have Never Addressed
This is the first Article VII school-finance case brought solely by school districts, without a single family or school student as plaintiff.
In Edgewood I, 68 school districts and “numerous individual school children and parents” filed suit.[20] Edgewood II involved subsequent proceedings in the same suit with the same parties.[21] Edgewood III was brought by “numerous school districts and individual citizens.”[22] Edgewood IV was filed by “hundreds of school districts ... as well as many parents and local officials.”[23]
None of these cases approved school-district standing under Article VII. Nor did they approve such standing implicitly, as standing cannot be waived and may be raised during any later appeal.[24]
To the contrary, in Edgewood IV, we held that section 3 of Article VII granted no constitutional rights to school districts:
Article VII, section 3 does not create any “rights.” It only authorizes the Legislature to establish school districts and to empower the districts to levy taxes for specific purposes. The school districts’ rights, to the extent they exist, are derived solely from the statutes that the Legislature may enact under the authority granted in section 3.[25]
Similarly, section 1 of Article VII does not create any rights for school districts; in fact, it does 'not even mention them. To the extent school districts assert injury here, they cannot do so for any violation of this constitutional right.
While school districts participated in all our prior Article VII cases, their standing was immaterial because school families participated too. When several parties make the same claim for declaratory or injunctive relief, standing for some renders standing for the remainder immaterial.[26] Federal law is to the same effect.[27] As all our prior cases included parties whose sole interest was the education of their children, the State had nothing to gain by objecting to school-district standing, and the judgments would have been no different if it had.
There is certainly no “broad rule that a governmental entity cannot sue to declare a statute unconstitutional.”[28] But there is no broad rule that they always have such standing either. Just because school districts have standing to bring some claims *805 does not mean they have standing to bring all claims.
Instead, standing depends on the nature and source of the claim being made.[29] While school districts have standing to pursue an Article VIII claim,[30] that does not mean they have standing to pursue an Article VII claim. We have never suggested otherwise, until today.
B. Standing We Have Never Recognized
Before today, we have never held that government agencies have standing to sue the State for a bigger budget.
The school districts allege they have insufficient money to carry out their duties, but it is not money for their own account. As we held long ago, school districts hold money only as trustees for school students:
School funds are held to be trust funds for educational purposes. Such funds do not belong to the district or to the officers of the district, but are merely held by them in trust for the public.[31]
The injury alleged in this case was suffered only by school students: to the extent school districts must cut courses, or eliminate extracurriculars, or hire less-qualified teachers, it is the students who suffer the concrete, personal harm rather than the districts themselves.
The school districts alleged only that inadequate state funding limited their ability to perform their official duties. Both state and federal courts have rejected standing by government officials to bring such claims.[32] Thus, we held in Brown v. Todd that a city councilman lacked standing to challenge a mayor’s personnel policy that did not apply to him, but merely infringed his ability to set such policies.[33] Similarly, the United States Supreme Court recently held that grant recipients but not members of Congress had standing to challenge the Line Item Veto Act(though the Act granted standing to both), as the former actually lost money while the latter lost only their discretionary power to dispense it.[34]
This is not a case like Nootsie, Ltd. v. Williamson County Appraisal District, in which a public entity was compelled to affirmatively grant a tax exemption it believed unconstitutional.[35] The districts do *806 not complain that they are affirmatively compelled to perform unconstitutional teaching, testing, or any other services;they complain only that they are underfunded.
The Court’s suggestion that we have recognized standing before in these circumstances is indefensible. In Vondy v. Commissioners Court, we ordered commissioners to pay a constitutionally required salary when they had refused to pay any.[36] In Mays v. Fifth Court of Appeals, we ordered commissioners to pay a statutorily allowed raise which they had ignored.[37] Both cases involved nondiscre-tionary ministerial acts;[38] neither involved a dispute between an agency and the State about whether the former’s budget was big enough.
The Court justifies standing here because “the Legislature has required school districts to achieve the goal of a general diffusion of knowledge.”[39] But that gives them no rights against the State. As we noted in Edgewood IV, the State can abolish school districts completely, or enlarge or diminish their powers.[40] Further, the Texas Constitution requires the Legislature to provide for many things—roads and bridges,[41] the Legislative Redistricting Board,[42] the Judicial Conduct Commission,[43] and the salaries of thousands of public employees.[44] These are all important items, and some may be underfunded; but surely all do not have standing to sue the State for more.
In every analysis of standing, “the plaintiff must contend that the statute unconstitutionally restricts the plaintiffs rights, not somebody else’s.”[45] This the school districts cannot do.
C. Priorities We Have Never Approved
One reason courts require standing is amply demonstrated by the evidence in this trial, which tended toward a wish-list for school district employees.
Eight superintendents testified for the school districts at trial, each listing what they needed or what they would do if they had more money. Their priorities were almost identical: more bilingual teachers, more certified teachers, more certified librarians, more teacher training, higher salaries, better benefits, smaller classes, and longer school years.
Each of these may be important. But if eight families from the same districts had testified at trial, is this what they would have listed? Assuming all could not be fully funded, would they have listed them in the same order? We simply do not know.
We do know that, for most of us, our priority as employees is higher salaries, *807 while our priority as customers is lower prices. Both may be possible when competition increases efficiency, innovation, and productivity. But at some point the two inevitably conflict, and some compromise is necessary. Because the trial here included only education providers and no education customers, the evidence may not accurately reflect where that line should be drawn.
Moreover, fundamental reforms may be overlooked if school districts may assert Article VII claims by themselves. Here, for example, not a single expert witness studied the possible savings that might accrue from consolidating some of the State’s 1,031 school districts. This Court has repeatedly lamented the “crazy-quilt pattern of small school districts,”[46] as a result of which “duplicative administrative costs are unavoidable.”[47] The plaintiffs’ experts confirmed that smaller districts have “the highest level of expenditures per student, as one would expect,” because of “diseconomies of scale.” Yet not a single school district or expert witness suggested any consolidations.[48]
It is unrealistic to ask school boards and administrators to recommend their own abolition, or lower salaries for themselves or any employees. Such potential conflicts between the interests of school districts and school families prevent the former from claiming standing to represent the latter. We have recognized representative standing in some circumstances,[49] and sometimes state agencies may assert standing on behalf of their constituents.[50] But we have done so only when the goals of a group and its members are so closely aligned that there is no reason to require participation by one in a suit by the other.[51] That is not the case here.
In its final analysis, the Court dispenses with standing generally, because (1) students and families were free to intervene, and (2) the districts could find students and families to back their claims. Even if we assume that poor families can hire lawyers, or school districts can recruit sham plaintiffs to bolster their claims, it is hard to see what that has to do with the standing of the parties actually before us. More important, such arguments could be made by every party who lacks standing, including millions of taxpayers,[52] or the father *808 whose challenge to the Pledge of Allegiance was recently rejected for lack of standing.[53] Normally, this Court strictly enforces standing so that we retain our proper role;[54] hopefully today’s exception is good for this case only.
Standing is not a technicality; it is essential to any court’s authority to decide a case.[55] We cannot abandon it in noteworthy cases; indeed, that is when adherence to legal standards is most important. As the United States Supreme Court recently noted, courts must be “especially rigorous” in requiring proper standing when asked to declare the actions of the other two branches of government unconstitutional.[56] The school districts alone cannot meet such standards here.
III. Article VIII & Discretion
No State ad valorem taxes shall be levied upon any property within this State.
Texas Constitution, Article VIII, § 1-e
The 47 plaintiffs, mostly property-rich school districts, bring a claim that Article VIII, section 1-e of the Texas Constitution is violated by a tax-rate ceiling in a single subpart of a single statute.[57] Unlike Article VII, Article VIII was intended to benefit school districts, and thus they have standing to assert this claim.[58]
In Edgewood III, we declined to adopt a precise test for violations of Article VIII because state control over property taxes presents “a spectrum of possibilities.”[59] Instead, we held that a tax violates Article VIII if the State so completely controls the levy, assessment, and disbursement of revenue that school districts are “without meaningful discretion.”[60] In Edgewood IV, we explained that districts lose such discretion when they are “forced to tax at the maximum allowable rate just to provide a general diffusion of knowledge.”[61]
This appeal turns on whether the plaintiffs proved they were “forced” to tax at the maximum rate. In reviewing the evidence, the Court contradicts everything we have said about such evidence before, and adds new “factors” we apparently overlooked before. This is too imprecise; a *809 legal standard cannot turn on entirely different evidence from one case to the next.
A. The Wrong Standard: Everybody Else Does It
The Court points to several statewide trends as evidence of an Article VIII violation. But in our previous cases, we held that evidence just like this could not show an Article VIII violation.
First, my colleagues suggest that school districts are forced to tax at maximum rates because about half of them do. While we have never stated in detail what the Article VIII standard means, we have stated one thing it does not mean — “the number of districts taxing at maximum rates is not determinative.”[62] In West Orange-Cove I, we expressly rejected arguments that an unconstitutional state property tax must control the rates in every district (the State’s position) or most districts (the trial court’s conclusion); instead, we held that an ad valorem tax is unconstitutional if it is imposed by the State, no matter how many districts it covers.[63] If the State could not use prevailing tax rates to prove the school districts should lose, why can the school districts now use them to prove they should win?
Second, the Court reverses field by concluding that elose-to-maximum rates show that many districts lack meaningful discretion. Only two years ago, we said close counts neither way: “It may be that a school district taxing at $1.47 instead of $1.50 has exercised meaningful discretion, but that is not necessarily the case.”[64] The number of districts taxing in this range simply cannot tell us whether “a single district ... is constrained by the State to tax at [this] particular rate.”[65]
Third, the Court finds it important that districts are taxing and spending 97 percent of the revenue that would be available if every district taxed at maximum rates.[66] But in Edgewood IV we noted, and school district witnesses conceded at trial, that financial incentives in the current school-finance system encourage school districts to tax at maximum rates even if they don’t have to.[67] The current system does not force districts to tax at maximum rates merely by providing incentives for them to do so.
Fourth, the Court announces today that substantial transfers of tax revenues from rich districts to poor districts are “a significant factor” in rendering the current system unconstitutional.[68] Of course, we demanded something along these very lines when we required equalized funding in *810 Edgewood I. Further, we held such transfers constitutional in Edgewood IV;[69] today’s opinion appears to adopt the dissent in the latter case.[70]
Finally, the Court supports its constitutional conclusion by noting a “marked decline” since 2001 in the number of districts that “exceed minimum accreditation standards.” [71] We have never before tied constitutional analysis to testing or accreditation scores, and today’s reference shows why we should be reluctant to enter that hotly debated area. For example, if the base year in this trend were 1994 rather than 2001, then there has been a marked increase in the number of districts exceeding minimum standards. Further, as the standards themselves are rising, declining scores may or may not reflect actual declines. And the “minimum” standard referenced here is “academically acceptable”; nothing in this rating system proves the State is “forcing” every school district to rate above average.
Surely we were not mistaken in all our previous cases. If revenue transfers and accreditation scores were relevant to Article VUI’s standard, it is curious that we have never mentioned them before. And merely looking at average tax rates cannot tell us whether any district was “forced” to that level or arrived there via “meaningful discretion.”
Whether any school district in Texas has lost “meaningful discretion” is not a standard that can be proved by statewide trends. School districts are not forced to tax or spend money just because everyone else does it.[72] The standards this Court has established require more specific evidence of a violation of Article VIII.
B. The Right Standard: What Must This District Do?
The school districts cannot establish a violation of Article VIII by proving that their current budgets are customary, or even reasonable; the tax cap they challenge is unconstitutional only if they proved they were forced to tax at that rate.
By definition, districts are not “forced” to make discretionary or voluntary expenditures. Of course, some expenditures may be mandatory de facto, even though not mandatory de jure.[73] For example, Texas school boards or administrators who cut football programs or drill teams (as the State’s attorneys bravely suggest) may soon find themselves looking for other occupations.
*811 But the Court adopts a standard far too low by holding that districts axe “forced” to tax at maximum rates whenever their “professional judgment and experience” suggests they should.[74] Undoubtedly, school districts want to give their students the best education possible, and an educator’s professional judgment would deem anything less to be undesirable. But in Edgewood IV, we rejected a claim that districts were “forced” to transfer revenues “because the various alternatives are all undesirable.”[75] By equating professional preferences with coercion, my colleagues again follow the dissent rather than the majority in Edgewood IV.[76]
The districts did offer examples of expenditures that were mandatory, and programs that were cut. But as proof that districts are forced to tax at maximum rates, both are non séquitos. Proving that some programs are mandatory does not prove that all others are too. Nor does it follow from cuts in one program that no further cuts can be made. To the contrary, the reluctance the superintendents expressed at trial about such cuts served to prove, if anything, their reluctance to cut any programs at all.
Moreover, the State’s trial evidence of discretionary spending did not focus on remedial-reading or bilingual-education programs. Instead, the State pointed to undisputed expenditures for swimming pools, nature trails, athletic stadiums, tennis courts, and unconventional classes such as broadcast journalism, ceramics, power lifting, ballet, film critique, lego robotics, advanced mariachi, and culinary arts.
It is true that several superintendents testified that all these programs were needed to keep students in school. But if we take these claims at face value then nothing schools spend is discretionary. “[A] claim will not stand or fall on the mere ipse dixit of a credentialed witness.” [77] These opinions alone cannot support the trial court’s judgment, both because they are conclusory,[78] and because the question is a legal one.[79] This Court is not usually so generous in treating such testimony as “facts, not opinions.”[80]
*812 Further, none of the school districts explained why they were “forced” to maintain athletic facilities or library services that local governments often provide, or unconventional classes that might be available through local community colleges or the internet. No one would suggest that communities can run their fire, police, or utility departments through a school district’s budget, thus shifting those costs to the State or richer districts. The trial court could not simply assume there were no alternative providers; the school districts had to prove it.
Similarly, several superintendents conceded paying the highest starting salaries in their region, or special stipends to attract particular types of teachers. Considering the importance of what they do, no one can begrudge teachers higher salaries; but these contribute to a violation of Article VIII only if school districts had no choice. If surrounding public or private schools pay less, it was the districts’ burden to prove why they could not.
When pressed to explain such expenses, district witnesses repeatedly pointed to the demands of their local communities. But again, local demand must be proved, not merely asserted. As no students or families testified at trial, the only proof was the conclusory assurances of school administrators.
In a democracy, community demand is proved by elections, not anecdotal hearsay. In many instances, schools can buy property using school bonds (which require electoral approval) or the general operations budget (which does not). We cannot tell from this record which programs had been approved at an election, or what percentage of the community actually participated. Surely a district cannot avoid elections on expensive programs, or schedule them to ensure low voter turnout,[81] and then claim they were forced to adopt those programs by their community.[82] Without such proof here, we simply cannot tell.
Finally, because fundamental reforms were never considered, we do not know whether they might allow districts to drop rates below the tax ceiling. School districts cannot spend money inefficiently (subverting Article VII) to “force” themselves to the tax ceiling (subverting Article VIII), as these articles must be construed consistently to give effect to both.[83] School districts may have good reasons to avoid consolidating, or starting school later in the year, or increasing class size so that teachers’ salaries could be increased too. But they are forced to make current expenses only if saving money through such alternatives was impossible, not just unpopular.
Of course, had the trial judge required specific evidence that the districts were forced to incur substantially all their current expenses, it would have been much more difficult for the districts to prove an Article VIII violation. But proving a stat *813 ute unconstitutional is not supposed to be easy. We must presume the current system is constitutional, and interpret it whenever possible in a manner that renders it so.[84] This presumption is “especially strong” when statutes relate to taxation,[85] and “especially important” when we deal with politically charged subjects like the schools.[86]
There was plenty of evidence at trial that public schools are being asked to carry increasingly heavy burdens, burdens that private schools often do not bear. For example, as one superintendent noted, “it is not easy to remove employees in the public sector.” Accountability and testing systems have raised expectations that somehow all schools and school children can be at or above average. Teachers and administrators face the risk that the failure of their students will cause their own professional efforts to be labeled “academically unacceptable.” And as all the witnesses agreed, a growing stream of immigrants with little formal schooling or English proficiency requires that public schools not only leave no child behind, but go back at great expense and pick up more as soon as they arrive.[87]
Nevertheless, the Article VIII standard is not whether educational expenditures are reasonable, or important, or far-sighted, or what a community would prefer, but whether a district is forced to make them. Before the courts can declare the State’s school-finance system unconstitutional, each and every district must prove it had no other choice. Here, none did.
IV. Equity & Overbroad Relief
Permanent injunctions “must be narrowly drawn,”[88] and “the record must contain evidence supporting each injunctive provision.” [89] This one meets neither standard.
It is neither true nor “worth repeating” that these standards can be ignored because the State asks for no injunction rather than a narrower one. A court must craft an equitable injunction even if it is *814 not precisely what either party wants.[90] If the rule were otherwise, the Court should not postpone the injunction here until June 2006 — as neither party asked for that. Hopefully, today’s rule is once again good for today’s case only.
A. Too Many Districts
First, there is no evidence to support a constitutional violation in every school district in Texas.
Out of 1,031 school districts in Texas, only 329 filed suit, only 47 asserted the single constitutional claim the Court affirms, only 9 presented proof on that claim in any detail, and only 3 called a witness to prove it at trial. On this narrow basis, the Court declares the school-finance system in every district unconstitutional, and enjoins state funding for them all. This is too broad.
As we recently noted, it has always been the law of equity that a permanent injunction “must not grant relief which is ... more comprehensive or restrictive than justified by the pleadings, the evidence, and the usages of equity.”[91] Thus, for example, a permanent injunction against protests at five physicians’ homes is too broad if the evidence shows protests occurred at only four.[92] Similarly, evidence of flies and foul odors from a 10-acre feedlot does not justify a permanent injunction extending to an entire 450-acre ranch.[93] An injunction may extend as far as the evidence, but no further.
In their Article' VIII claim, the plaintiffs did not challenge the tax-rate cap facially,[94] but only as it applied to them. “In an as-applied constitutional challenge, we must evaluate the statute as it operates in practice against the particular plaintiff.”[95] Yet the trial court did not even try to evaluate how the property-tax cap operates in practice against most of the 47 plaintiffs, much less the other 984 districts covered by the statewide permanent injunction. As the question is one of constitutionality, we cannot simply presume that all districts are alike.
The trial judge pointed to evidence from nine “focus districts” and the testimony of a dozen superintendents as proof that loss of meaningful discretion was “systemic/statewide.” But there was no evidence these districts were, statistically representative of all others. To the. contrary, the handful of successful focus districts were un representative — 78 percent of the plaintiffs’ focus districts were poor districts, while 72 percent of the actual plaintiffs were rich ones.
Nor did the parties agree that proof about the focus districts proved anything *815 about the rest. Even if they had, such an agreement would be unenforceable. In Terrazas v. Ramirez, we reversed a permanent injunction that ordered election redistricting based on an agreement by all the parties (including the Governor and Attorney General),[96] noting that such agreements are generally unenforceable in cases affecting the public:
Apportionment affects every person in the State, yet only a very few parties can be involved in any lawsuit challenging redistricting. The trial court must attempt to consider the interests, not only of the parties in the case, but of others who are not present. For this reason, the agreement of the parties in a reapportionment lawsuit cannot alone be conclusive of either the validity of the statute or, if it is found to be invalid, the relief to be granted.[97]
Similarly, as schools and property taxes affect far more Texans than the parties at this trial (none of whom, again, were simply taxpayers or families of school children), the trial court could not grant relief covering districts as to which there was no proof.[98]
In a state as diverse as Texas, some programs and expenses may be mandatory in one district, but supplemental in another. Even if a dozen districts proved that they were forced to incur all their expenditures (which none did), that would not justify an injunction extending beyond them.[99]
This is not a class action. No class has been certified, and given the individual ways in which each school district spends money, it is unlikely any could be. But even if one was, we could not grant relief extending to nonparty school districts without a “rigorous analysis.”[100] Yet the Court today grants a statewide injunction affecting hundreds of nonparty school districts without class certification, evidence, analysis, or even an explanation. This looks too much like “enjoin now and worry later.”[101]
B. Too Many Statutes
Second, there is no evidence to support an injunction against every statutory aspect of the Texas school-finance system.
The Court finds only one constitutional violation — that the tax-rate ceiling in subsection 45.003(d) of the Education Code violates Article VIII. As already noted, there is no evidence showing this is the case in every school district in Texas. But even if there were, that would justify nothing beyond declaring this one subsection unconstitutional.
When we declared a single provision of the Water Code an unconstitutional delegation to landowners, we did not enjoin all water quality regulations in Texas.[102] *816 When we found a single provision of the Tax Code unconstitutional, we did not enjoin all taxes; to the contrary, we reformed the lower court’s injunction to make it narrower.[103] When we found an absolute two-year statute of limitations for medical malpractice claims unconstitutional as applied to minors, we did not enjoin the entire statute but merely tolled limitations for minors.[104]
In each of these cases, we narrowly limited our orders to the legislation we found unconstitutional. By the same standard, if the Legislature imposed a property tax on the nine Texas counties whose names begin with “J”, surely we would declare only that statute unconstitutional; we would not stop all state funding in those counties, much less in the other 245.
But today the Court does precisely that, finding one subsection unconstitutional as applied to nine focus districts, and then affirming an injunction against the entire Texas school-finance system. This injunction includes most of Chapters 41 and 42 of the Texas Education Code — a collection of almost 100 different statutes. This is far too broad.
The Court acknowledges that the single violation here could be corrected by limiting relief to that single statute.[105] But it imposes far more sweeping relief, on the ground that we must “leave such matters to the discretion of the Legislature.”[106] In other words, rather than enjoining a single statute in a handful of districts, the Court enjoins scores of statutes across the entire State — in deference to the Legislature. Reasonable people may question whether this is very much deference.
It is true that we have enjoined the entire school-finance system before, but never for grounds as limited as those here.[107] In Edgewood I and II, there was a “fundamental flaw” in the system, “not in any particular provisions but in its overall failure to restructure the system.”[108] By holding that Article VII required the entire system to “draw revenue from all property at a substantially similar rate,”[109] our ruling could not be narrowly limited to a small part.
Similarly, because the statute we held unconstitutional in Edgewood III mandated a state property tax in every Texas county, the injunction we issued had to *817 cover every county too.[110] Nor could we limit relief to the portion of the system held unconstitutional, as there would have been little financing left over for schools without it.[111]
By comparison, nothing about the Article VIII claim here inevitably extends to the whole school-finance system. Surely a single violation of Article VIII anywhere cannot justify an injunction shutting down school finances everywhere.
The Court says the current system cannot survive without the tax-rate cap, because “for districts that need additional revenue, the funding system would be inefficient.” [112] But the Court cannot have it both ways — if school districts “need” more funding, then current funding cannot be adequate for a general diffusion of knowledge; conversely, if the current funding is adequate (as the Court explicitly holds), then the cap only affects supplemental spending. As the Texas Constitution does not guarantee equal supplemental spending,[113] the cap is hardly “central” to a constitutional system.[114]
Of course, it is no mystery why the plaintiff school districts never asked for narrower relief. If only section 45.003(d) were declared unconstitutional, they would once again have meaningful discretion to set tax rates as they wish, and could raise them to pay for all the programs they say their communities demand. But they also might find out at the next election that their beliefs about community demand were somewhat exaggerated.
Instead, by enjoining school-finance across the state, the school districts here hope to obtain funding from sources other than those within their own borders. Raising revenues from outside sources is unlikely to make school districts more accountable or more efficient. Neither equity nor the Texas Constitution allows school districts to demand supplemental programs on condition that someone else pay for them.
* * * * * *
The Court closes by reminding the Legislature how important education is to the future of this State and its people. This seems an odd way to conclude an opinion that rejects every claim except that the Legislature has imposed a statewide ad valorem tax. If our goal is to improve education, we should not enjoin the entire school-finance system on collateral grounds to pressure the Legislature to change it.
But we should demand efficiency, as that is what the Texas Constitution requires. Recognizing the common meaning of “efficient” would not require us to abandon our previous school-finance cases, or the equity for Texas schools they require. But we cannot keep overlooking the one standard the Texas Constitution explicitly demands. Nor do we help Texas school children by insisting “efficient” means nothing beyond equal access to taxes.
Someday, the Texas school system must become “efficient” by 21st century stan *818 dards. As that is what the Texas Constitution requires, we should start that process today.

. Edgewood. Indep. Sch. Dist. v. Kirby, 777 S.W.2d 391, 397 (Tex.1989). This initial state suit followed an unsuccessful federal class action filed solely by parents. See San Anto *801 nio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

. Edgewood Indep. Sch. Dist. v. Kirby, 804 S.W.2d 491, 493 (Tex.1991).

. Carrollton-Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist., 826 S.W.2d 489, 493 (Tex.1992).

. Edgewood Indep. Sch. Dist. v. Meno, 917 S.W.2d 717, 725-26 (Tex.1995) ("Our judgment in this case should not be interpreted as a signal that the school finance crisis in Texas has ended .... Surely Texas can and must do better.”).

. W. Orange-Cove Consol. I.S.D. v. Alanis, 107 S.W.3d 558, 583 (Tex.2003).

. See TEX. CONST. of 1869, art. IX, § 1 ("It shall be the duty of the Legislature of this State, to make suitable provisions for the support and maintenance of a system of public free schools, for the gratuitous instruction of all the inhabitants of this State, between the ages of six and eighteen years.”); TEX. CONST. of 1866, art. X, § 1 ("A general diffusion of knowledge being essential to the preservation of the rights and liberties of the people, it shall be the duty of the Legislature of this State to make suitable provision for the support and maintenance of public schools.”); TEX. CONST. of 1861, art. X, § 1 (same); TEX. CONST. of 1845, art. X, § 1 (same).

. TEX. CONST. art. VII, § 1 (emphasis added).

. Edgewood I, 777 S.W.2d at 395; see also WEBSTER’S NEW COLLEGIATE DICTIONARY 359 (1980) (defining "efficient” as “productive without waste”); Wikipedia, the Free Encyclopedia, Efficient, at http://en.wik-ipedia. org/wiki/Efficient (last visited Oct. 13, 2005) ("Efficiency is the capability of acting or producing effectively with a minimum of waste, expense, or unnecessary effort.”).

. Edgewood I, 777 S.W.2d at 397.

. See, e.g., William G. Young, An Open Letter to U.S. District Judges, FED. LAW., July 2003, at 30, 30 ("The American jury system is withering away. This is the most profound change in our jurisprudence in the history of the Republic."); Mark W. Bennett et al., Judges’ Views on Vanishing Civil Trials, 88 Judicature 306, 306 (2005).

. 176 S.W.3d at 792-93.

. 176 S.W.3d at 792.

. See TEX. CONST. art. I, § 15 (requiring the Legislature to maintain "purity and efficiency” of right to trial by jury); id. art. V, § 31 ("The Supreme Court is responsible for the efficient administration of the judicial branch .... ”).

. See id. art. VII, § 1; id. art. VII, §§ 17(h), 18(h) (allowing legislation "[t]o assure efficient use of construction funds and the orderly development of physical plants” at educational institutions). The only other use of "efficient” or "efficiency” in the Texas Constitution concern laws punishing the embezzlement of public funds, id. art. IV, § 25, and enforcing mechanics’ and materialmen’s liens, id. art. XVI, § 37.

. 176 S.W.3d at 790.

. See Edgewood IV, 917 S.W.2d at 725-26.

. Barshop v. Medina County Underground Water Conservation Dist., 925 S.W.2d 618, 626 (Tex.1996).

. See TEX. CONST. art. II, § 1.

. See id. art. I, § 13; Texas Ass’n of Bus. v. Texas Air Control Bd., 852 S.W.2d 440, 444 (Tex.1993).

. Edgewood I, 777 S.W.2d at 391-92.

. See Edgewood II, 804 S.W.2d at 493.

. Edgewood III, 826 S.W.2d at 493.

. Edgewood IV, 917 S.W.2d at 727.

. W. Orange-Cove I, 107 S.W.3d at 583 (holding standing cannot be waived "and may thus be raised at any time”).

. 917 S.W.2d at 739.

. Texas Workers’ Comp. Comm’n v. Garcia, 893 S.W.2d 504, 519 (Tex.1995) ("Because the other plaintiffs, except for Fuller, bring the same facial challenges and seek the same declaratory relief as the Texas AFL-CIO, we need not address their individual standing and we express no opinion thereon.”); Robbins v. Limestone County, 114 Tex. 345, 268 S.W. 915, 917 (1925) ("There being parties plaintiff who are competent to prosecute the suit, it becomes immaterial in this case whether or not the other parties, the individual plaintiffs, are authorized to prosecute it.”).

. Clinton v. City of New York, 524 U.S. 417, 431 n. 19, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) ("Because both the City of New York and the health care appellees have standing, we need not consider whether the appellee unions also have standing to sue.”).

. 176 S.W.3d at 772.

. Raines v. Byrd, 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) ("The standing inquiry focuses on whether the plaintiff is the proper party to bring this suit, although that inquiry often turns on the nature and source of the claim asserted.”’) (citations omitted).

. W. Orange-Cove I, 107 S.W.3d at 584.

. Love v. City of Dallas, 120 Tex. 351, 40 S.W.2d 20, 27 (1931) (citation omitted).

. As standing to assert a constitutional violation of Article VII is a question of first impression, "we may look to the similar federal standing requirements for guidance.” Brown v. Todd, 53 S.W.3d 297, 305 (Tex.2001); Texas Ass’n of Bus., 852 S.W.2d at 444.

. Brown, 53 S.W.3d at 305-06 (holding councilman's complaint was "vague and generalized, not personal and particularized”).

. See Clinton, 524 U.S. at 430-31, 118 S.Ct. 2091; Raines, 521 U.S. at 815, 829, 117 S.Ct. 2312 (rejecting legislators’ injury as “institutional injury” that was "abstract and widely dispersed,” although noting that Act expressly authorized " '[a]ny Member of Congress or any individual adversely affected’ by the Act to bring an action for declaratory judgment or injunctive relief on the ground that any provision of the Act is unconstitutional.”).

. 925 S.W.2d 659, 663 (Tex.1996) (holding defendant appraisal district had standing, as otherwise it would have to affirmatively grant tax exemption it believed unconstitutional); see also Bd. of Educ. v. Allen, 392 U.S. 236, 241 n. 5, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) (holding school board members had standing to complain that statute required them to distribute books in violation of constitution).

. 620 S.W.2d 104, 109 (Tex.1981).

. 755 S.W.2d 78, 79 (Tex. 1988).

. See Mays, 755 S.W.2d at 79 (“We hold that the pay increase ... was a ministerial act to be performed by the Commissioners Court and an act in which the Legislature left no discretion.”); Vondy, 620 S.W.2d at 109 ("CT]he performance of a clear statutory duty which is ministerial and nondiscretionary should be mandated by the district court.”).

. 176 S.W.3d at 773.

. Edgewood IV, 917 S.W.2d at 739 (citing Love, 40 S.W.2d at 26).

. See TEX. CONST. art. XVI, § 24.

. See id. art. III, § 28.

. See id. art. V, § 1-a(2).

. See id. art. III, § 44; Art. V, § 21; see also Art. XVI, § 10.

. Garcia, 893 S.W.2d at 518 (citing Broadrick v. Oklahoma, 413 U.S. 601, 610, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)).

. Edgewood III, 826 S.W.2d at 495.

. Edgewood II, 804 S.W.2d at 497; see also Edgewood IV, 917 S.W.2d at 726.

. Of course, consolidation may not always be attainable or efficient. Perhaps local residents of McLennan County, for example, prefer to pay extra so their students can be distributed among 20 different school districts, or perhaps this is the most efficient system. But surely sometimes consolidation would be both efficient and attainable, especially if it left more money for actual education.

. See Texas Ass’n of Bus., 852 S.W.2d at 447-48.

. Hunt v. Washington State Apple Advertising Comm’n, 432 U.S. 333, 344, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

. Texas Ass’n of Bus., 852 S.W.2d at 447 (noting that one requirement for associational standing is that neither claim asserted nor relief requested requires participation of individual members in the lawsuit); cf. Hunt, 432 U.S. at 345, 97 S.Ct. 2434 (approving associational standing as the "financial nexus between the interests of the Commission and its constituents coalesces”); see also Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 610 n. 16, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982) (noting that with respect to relations between citizens and the federal government, it is the larger governmental unit rather than the smaller that stands as parens patriae ).

. See Osborne v. Keith, 142 Tex. 262, 177 S.W.2d 198, 200 (1944) ("Governments cannot operate if every citizen who concludes that a public official has abused his discretion *808 is granted the right to come into court and bring such official’s public acts under judicial review.”).

. See Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 15, 124 S.Ct. 2301, 2310-12, 159 L.Ed.2d 98 (2004) (holding non-custodial father did not have standing to sue on his daughter's behalf).

. See, e.g., Brown, 53 S.W.3d at 304-06; M.D. Anderson Cancer Ctr. v. Novak, 52 S.W.3d 704, 708 (Tex.2001); Texas Dep’t of Protective and Regulatory Servs. v. Sherry, 46 S.W.3d 857, 862 (Tex.2001); Bland Indep. Sch. Dist. v. Blue, 34 S.W.3d 547, 558 (Tex.2000); see also Raines, 521 U.S. at 820, 117 S.Ct. 2312 (holding that standing is an "overriding and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere” that required the Court to “put aside the natural urge to proceed directly to the merits of this important dispute and to settle' it for the sake of convenience and efficiency”).

. Texas Ass’n of Bus., 852 S.W.2d at 443.

. Raines, 521 U.S. at 819-20, 117 S.Ct. 2312 ("We have always insisted on strict compliance with this jurisdictional standing requirement. And our standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional.”) (citations omitted).

. TEX. EDUC. CODE § 45.003(d).

. W. Orange-Cove I, 107 S.W.3d at 584.

. Edgewood III, 826 S.W.2d at 503.

. Id. at 502.

. Edgewood IV, 917 S.W.2d at 738.

. W. Orange-Cove I, 107 S.W.3d at 582.

. Id. at 578-79 ("Thus, a single district states a claim under article VIII, section 1-e if it alleges that it is constrained by the State to tax at a particular rate.”).

. W. Orange-Cove I, 107 S.W.3d at 583.

. Mat 579.

. 176 S.W.3d at 796.

. Edgewood IV, 917 S.W.2d at 738 ("Although financial incentives for property-poor districts and the desire to maintain previous levels of revenue in the property-rich districts may encourage districts to tax at the maximum allowable rate, the State in no way requires them to do so.”); id. at 765 (Hecht, J., dissenting) ("[School districts] will move immediately to the maximum rate, either out of desire to maximize the funds they receive from the State, or out of necessity to obtain funds essential to their present level of operation _Both the district court and all parties acknowledge that every school district in Texas will move as quickly as possible to the maximum $1.50 rate because of the provisions of Senate Bill 7.”).

. 176 S.W.3d at 797.

. See Edgewood IV, 917 S.W.2d at 739 (holding school-finance system did not violate Article VIII by allowing taxpayers to choose whether to pay for education of nonresident students, purchase average daily attendance credits, or contract for the education of nonresident students).

. See 917 S.W.2d at 759 (Hecht, J., dissenting) ("I believe that the provisions of Senate Bill 7 which permit — in reality coerce — some school districts to pay the cost of education in other districts ... violate article VII, section 3 of the Texas Constitution”).

. 176 S.W.3d at 797.

. In a competitive market, one might plausibly assume that most expenditures are necessary, as those who spend wastefully will fail. But the public schools (like most government operations) are not subject to the same rules; no matter how a district spends money, property owners must pay local taxes, school children must attend assigned schools, and attendance remains free.

. W. Orange-Cove I, 107 S.W.3d at 582 (noting that the Legislature may pressure school districts to tax at maximum rates "[b]y authorizing local-option homestead exemptions, knowing that some constituencies will insist on them”).

. 176 S.W.3d at 796.

. Edgewood IV, 917 S.W.2d at 739.

. 917 S.W.2d at 763 (Hecht, J., dissenting) ("The State's argument that Senate Bill 7 does not coerce districts to choose options (3) and (4) in section 36.003, but simply allows them those alternatives, can hardly be taken seriously. The Legislature is fully aware that school districts will avoid consolidation and permanent property detachment at virtually all costs.”).

. Romero v. KPH Consol., Inc., 166 S.W.3d 212, 223 (Tex.2005); Volkswagen of Am., Inc. v. Ramirez, 159 S.W.3d 897, 913 (Tex.2004); Coastal Transp. Co. v. Crown Cent. Petroleum Corp., 136 S.W.3d 227, 232 (Tex.2004); Burrow v. Arce, 997 S.W.2d 229, 235 (Tex.1999).

. Coastal Transp., 136 S.W.3d at 232 (holding unobjected-to conclusory testimony insufficient to support judgment).

. City of Keller v. Wilson, 168 S.W.3d 802, 812 (Tex.2005).

. 176 S.W.3d at 796; see, e.g., Gen. Motors Corp. v. Iracheta, 161 S.W.3d 462, 468 (Tex.2005)(holding that expert’s testimony that gasoline did not escape from filler neck was unsupported opinion); Volkswagen, 159 S.W.3d at 911 (holding expert's testimony that "laws of physics” kept wheel within wheel well was unreliable opinion); Coastal Transp., 136 S.W.3d at 232 (holding expert’s testimony that continued use of allegedly defective probes showed conscious indifference was conclusory opinion); Kerr-McGee Corp. v. Helton, 133 S.W.3d 245, 257-58 (Tex.2004) (holding expert’s failure to explain how various factors affected his calculations rendered opinion unreliable).

. See TEX. ELEC. CODE § 41.001.

. A party seeking an equitable remedy like the permanent injunction here must do equity, and come to court with clean hands. See Mfrs’ Fin. Co. v. McKey, 294 U.S. 442, 449, 55 S.Ct. 444, 79 L.Ed. 982 (1935); King v. Hamilton, 29 U.S. 311, 311, 4 Pet. 311, 7 L.Ed. 869 (1830); Truly v. Austin, 744 S.W.2d 934, 938 (Tex.1988); City of Wink v. Griffith Amusement Co., 129 Tex. 40, 100 S.W.2d 695, 702 (1936).

.Doody v. Ameriquest Mortgage Co., 49 S.W.3d 342, 344 (Tex.2001) ("We construe constitutional provisions and amendments that relate to the same subject matter together and consider those amendments and provisions in light of each other. And we strive to avoid a construction that renders any provision meaningless or inoperative.”) (citations omitted).

. See TEX. GOV’T CODE § 311.021(1); FM Props. Operating Co. v. City of Austin, 22 S.W.3d 868, 873 (Tex.2000); Quick v. City of Austin, 7 S.W.3d 109, 115 (Tex.1999).

. Vinson v. Burgess, 773 S.W.2d 263, 266 (Tex.1989).

. Cf. Terrazas v. Ramirez, 829 S.W.2d 712, 717 (Tex.1991) ("Yet a court’s duty to consider a party’s constitutional challenge to a statute, never to be taken lightly, and the deference owed a coordinate branch of government, are rarely more sensitive or serious matters than when the statute attacked involves the highly politically charged subject of apportionment.”); see Edgewood IV, 917 S.W.2d at 759 ("Texas’ public school finance system is not the product of careful study and planning, but of historical anomalies and political pressures over the course of more than a century.”); Mark G. Yudof, School Finance Reform: Don’t Worry, Be Happy, 10 REV. LITIG. 585, 597 (1991) ("Given the passions, entrenched bureaucracies, scarcity of resources, and conflicting interests, informed political horse-trading and not rational models have and will continue to carry the day in education finance.”).

. The superintendent of the Dallas Independent School District testified that (1) 60 percent of incoming immigrant students were teenagers, (2) "[n]ot only are they limited English speakers, they’re limited academically,” and (3) the cost of educating them "could be as much as double what we’re spending per child right now.”

. Schneider Nat’l Carriers, Inc. v. Bates, 147 S.W.3d 264, 287 (Tex.2004); Holubec v. Brandenberger, 111 S.W.3d 32, 40 (Tex.2003) (quoting Brown v. Petrolite Corp., 965 F.2d 38, 51 (5th Cir.1992)).

. Operation Rescue-Nat’l v. Planned Parenthood of Houston, Inc., 975 S.W.2d 546, 560 (Tex.1998); see also Holubec, 111 S.W.3d at 39.

. See JOHN NORTON POMEROY, 1‘ A TREATISE ON EQUITY JURISPRUDENCE, § 109 (Spencer W. Symons ed., 5th ed. 1941) ("Equitable remedies, on the other hand, are distinguished by their flexibility, their unlimited variety, their adaptability to circumstances, and the natural rules which govern their use. There is in fact no limit to their variety and application; the court of equity has the power of devising its remedy and shaping it so as to fit the changing circumstances of every case and the complex relations of all the parties.”).

. Holubec, 111 S.W.3d at 39.

. Operation Rescue-Nat’l, 975 S.W.2d at 568, 570.

. Holubec, 111 S.W.3d at 39-40 (remanding that issue for trial).

. A party alleging a statute is facially unconstitutional must prove that it always has and always will operate unconstitutionally. City of Corpus Christi v. Pub. Util. Comm’n, 51 S.W.3d 231, 241 (Tex.2001); Nootsie, 925 S.W.2d at 662. The tax-rate cap has been in effect for decades. See W. Orange-Cove I, 107 S.W.3d at 564.

. Texas Mun. League, 74 S.W.3d at 381.

. 829 S.W.2d 712, 718-20 (Tex.1991).

. Id. at 718-19.

. The trial judge also cited evidence that less than all students passed TAKS tests or met college-readiness standards as evidence that every district had to spend more. Even assuming the Constitution requires schools to spend money until 100 percent of their students graduate and go to college, there was no evidence indicating how much each district would have to spend or how much each district might save from other operations to meet this standard.

. See W. Orange-Cove I, 107 S.W.3d at 578-79.

. Southwestern Refining Co., Inc. v. Bernal, 22 S.W.3d 425, 435 (Tex.2000).

. See id. (holding that in certifying a class action “[w]e reject this approach of certify now and worry later.”).

. See FM Properties, 22 S.W.3d at 888 (affirming permanent injunction against water plans adopted pursuant to unconstitutional provision).

. Cent. Appraisal Dist. v. Lall, 924 S.W.2d 686, 687 (Tex.1996).

. Weiner v. Wasson, 900 S.W.2d 316, 321 (Tex.1995).

. 176 S.W.3d at 798-99 ("The constitutional violation cannot be corrected without raising the cap on local tax rates or changing the system.”); see also Edgewood IV, 917 S.W.2d at 759 (Hecht, J., concurring and dissenting) ("I believe that the provisions of Senate Bill 7 which permit — in reality coerce — some school districts to pay the cost of education in other districts in lieu of forced consolidation of districts or property detachment violate article VII, section 3 of the Texas Constitution as construed in Love v. City of Dallas, 120 Tex. 351, 40 S.W.2d 20 (1931). This violation is not in my view fatal to the entire finance system; operation of the offending provisions could be enjoined without disturbing the remainder of Senate Bill 7, and I would do so even though the resulting system would be far different from the one now in place.”).

. 176 S.W.3d at 799.

. We have specifically reserved ruling on this question before. See W. Orange-Cove I, 107 S.W.3d at 579 ("Thus, a single district states a claim under article VIII, section 1-e if it alleges that it is constrained by the State to tax at a particular rate. How a constitutional violation in one or a few school districts would impact the public school finance system as a whole is not before us.”).

. 804 S.W.2d at 496.

. Id. (emphasis added).

. 826 S.W.2d at 500.

. Id. at 515 (“We cannot, however, restrict our holding to only those portions of the statute which create CEDs and require them to tax. Were we to do so, the finance system that remained — if a system could be discerned in the remnants at all — would bear no resemblance to that which the Legislature intended, and would do nothing to remedy the dispari-des in school funding condemned in Edge-wood I and Edgewood II.").

. 176 S.W.3d at 798.

. W. Orange-Cove I, 107 S.W.3d at 566; Edgewood I, 777 S.W.2d at 398.

. 176 S.W.3d at 752.